Estate of R. D. McDaniel, Deceased, Mabel McDaniel, Community Survivor, and Mabel McDaniel, Individually v. Commissioner.
Estate of McDaniel v. Commissioner
Docket Nos. 73762, 79472.
United States Tax Court
T.C. Memo 1961-302; 1961 Tax Ct. Memo LEXIS 45; 20 T.C.M. (CCH) 1551; T.C.M. (RIA) 61302; 15 Oil & Gas Rep. 231; October 31, 1961
*45 Richard E. McDaniel, Esq., P.O. 772, Center, Tex., for the petitioners. Harold D. Rogers, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in the income tax of the petitioners and additions to tax for the indicated years as follows: Addition to Tax
Sec. 6653(b),
Docket No.
Year
Deficiency
I.R.C. 1954
73762
1954
$1,436.22
$ 718.11
79472
1955
2,486.53
1,243.26
The issues for determination are the correctness of the respondent's action (1) in determining that R. D. McDaniel was not a partner with D. L. Rose in the conduct of business under the name of D. L. Rose Drilling Contractor during 1954 and 1955, (2) in failing to determine that certain amounts reported for 1954 and 1955 as income from salary or wages were not income, (3) in determining that petitioners had unreported income of $4,727.50 and $7,625 for 1954 and 1955, respectively, (4) in disallowing deductions of $1,689.17 and $830.78 taken as distributive shares of partnership losses for 1954 and 1955, respectively, (5) in disallowing a deduction of $890.87 for 1954 for repairs to *46 an airplane, (6) in disallowing a deduction of $4,000 taken for 1955 as a casualty loss sustained on an airplane, and (7) in determining additions to tax for 1954 and 1955 under section 6653(b) of the Internal Revenue Code of 1954 for fraud. General Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioners are the estate of R. D. McDaniel, deceased, Mabel McDaniel, community survivor, and Mabel McDaniel, individually. R. D. McDaniel, sometimes hereinafter referred to as the decedent, died intestate on December 13, 1956. He and Mabel McDaniel were residents of Albany, Texas, during 1954 and 1955 and filed their joint Federal income tax returns for those years with the director in Dallas, Texas. Issue 1. Existence of Partnership Issue 2. Amounts Reported as Income From Salary or Wages Issue 3. Amounts of Unreported Income Issue 4. Deductions Taken for Distributive Shares of Partnership Losses Findings of Fact On September 25, 1949, D. L. Rose of Albany, Texas, and the decedent entered into an agreement, sometimes hereinafter referred to as the agreement of September 25, 1949, which provided, in part, *47 as follows: 1. That the parties hereto hereby undertake and consent to a working agreement for a joint enterprise in the business of drilling oil and gas wells and producing oil and gas, which said agreement shall, in the manner, at the time, and under the hereinafter named conditions, culminate in a partnership wherein the proportionate ownership of the parties hereto, in and of the assets, liabilities, and profits of the same shall be as follows, to-wit: D. L. Rose, 75 percent thereof; R. D. McDaniels [McDaniel], 25 per cent. thereof; it being expressly understood and agreed that ownership of all the assets of the said enterprise shall be and remain the property of D. L. Rose until the said D. L. Rose shall have been fully paid for the property and funds contributed by him to the said enterprise. 2. That the said D. L. Rose has put into said enterprise, as capital stock, a rotary drilling rig of the value of ninety thousand dollars ($90,000.00), and will invest such further property or sums of money as shall be necessary and appropriate to the operation of the business, and will exercise the powers of general manager of said enterprise, at all times during the continuance *48 of this business agreement both before and after the assets of the enterprise shall have been fully paid for; it being expressly understood and agreed, however, that the said D. L. Rose shall not be restricted in his right to carry on his other business of any nature whatsoever, inasmuch as this enterprise is joint only insofar as it covers the property herein described and the efforts of the parties herein agreed upon. 3. That the said R. D. McDaniel will at all times during the continuance of this agreement, use his undivided and utmost endeavors to the best of his skill and ability to promote and enhance the mutual interest of the parties hereto and will not, at any time during the continuance of this agreement, exercise or follow the said trade or business, or any other, to his private benefit or advantage. 4. That in all matters respecting the several transactions of the enterprise and the management of the business thereof, the said D. L. Rose shall exercise complete managerial and supervisory control at all times, and the said D. L. Rose shall be responsible for and shall provide for the keeping of separate and accurate books of account wherein shall be entered and set *49 down an account of all the money and property invested, received, and expended in and about the said business, and all other matters and things in any wise belonging or appeartaining thereto and either of the parties may have access to said books. It is further expressly agreed that no contract or indebtedness on behalf of the said business shall be created or made without the consent of the said D. L. Rose. 5. That it shall be lawful for each of the parties hereto to take out of the cash of the enterprise a maximum of four hundred dollars ($400.00) during any one calendar month, to his own use, the same to be charged on account, excepting that the expenses of conducting the business of the enterprise, when said expenses are carefully and accurately itemized, may be taken out of the cash of the enterprise. The maximum of $400.00 permissible to be withdrawn to the own use of either party in any one calendar month shall be culminative [culminate] from month to month. Other portions of the agreement related to a continuance of the business in case of the death or disability of either party to the agreement and to the procedures to be followed in the event either party desired *50 to withdraw from the enterprise or to assign or sell his interest therein. Upon execution of the above-mentioned agreement Rose and decedent began operations thereunder which were conducted under the name of D. L. Rose Drilling Contractor, sometimes referred to in the record as D. L. Rose Drilling Company, and sometimes hereinafter referred to as Rose Drilling. In the conduct of the operations the decedent in 1949 and thereafter through 1955 performed the work of a tool pusher and a superintendent of drilling. He had authority to sign checks drawn on the bank account of Rose Drilling for labor employed in the business and also had authority to make purchases of supplies necessary for the maintenance of the rigs which were operated under his supervision. Invoices for such supplies were sent by the sellers to the office of Rose Drilling and, upon decedent's approval thereof, were paid by checks drawn by the bookkeeper of Rose Drilling on its bank account and sent to the sellers. The supplies so purchased and paid for comprised less than 10 percent of total purchases annually made by Rose Drilling. Shortly after entering into the agreement of September 25, 1949, decedent proposed *51 to and entered into an arrangement with Eura Henderson, owner and operator of the Albany Welding Service, Albany, Texas, to the effect that decedent would furnish certain drill bits to Henderson to be worked on, that Henderson would do the required work and would send a sales invoice of the bits to Rose Drilling and, upon receipt of payment from Rose Drilling of the invoices and after deducting his charge for the work done on the bits, Henderson would pay decedent 50 percent of the net amount received from Rose Drilling. Under the arrangement decedent would bring bits to Henderson's place of business and take them out. Beginning October 27, 1949, and continuing through November 16, 1953, Henderson, under the foregoing arrangement, paid decedent by check the following amounts during the indicated years: 1949
$ 444
1950
1,191
1951
6,750
1952
4,215
1953
3,620
Total
$16,220 Henderson informed decedent that he was making the payments by check in order that he (Henderson) would have a record to show that the full amount of the payments received from Rose Drilling was not his income. To this, the decedent replied that he would take care of that matter. During *52 the latter part of 1953 Henderson sold the Albany Welding Service business to Bob Halford who knew of the abovementioned arrangement between decedent and Henderson. Shortly after Halford acquired the business the decedent proposed and entered into an arrangement with Halford like that which decedent had entered into with Henderson. Halford terminated the arrangement in the latter part of 1954 because decedent wanted more than 50 percent of the net amount obtained from Rose Drilling. During 1954 Halford, under his arrangement with decedent, paid the latter a total of $3,150. During 1954 and 1955 Floyd Mitchell, also known as Bud Mitchell, operating under the name of Bud Mitchell Welding Company, was engaged in the oil field service business, operating an engine and welding shop in Abilene, Texas. In 1954 decedent asked Mitchell about - running some bits through me [Mitchell] and letting Rose Drilling Company pay me [Mitchell] so that they [Rose Drilling] would have a bill head in their office to show what the checks were being written for. and Mitchell paying to decedent the amounts Mitchell received from Rose Drilling. Mitchell, being of the impression that such a procedure *53 would be an accommodation to Rose Drilling, acceded to decedent's request. Thereafter, and pursuant to the foregoing arrangement, Mitchell at the request of the decedent issued to Rose Drilling in 1954 four sales invoices for bits totaling $1,795 and in 1955 nine sales invoices for bits totaling $5,425. In payment of the invoices Mitchell received checks from Rose Drilling in 1954 totaling $1,795 and in 1955 checks totaling $5,425. With the exception of items amounting to $250 of the total of the invoices for 1954 and $250 of the total of the invoices for 1955, which represented materials furnished by Mitchell to Rose Drilling during the respective years, Mitchell had no knowledge respecting the items which he, at decedent's request, invoiced to Rose Drilling in 1954 and 1955. Upon receipt of the checks from Rose Drilling in payment of the invoices Mitchell deposited most of them in his bank account and then paid decedent by check. However, some of the payments made to decedent were made in cash. Of the $1,795 received by Mitchell from Rose Drilling in 1954 Mitchell paid the decedent $1,545 during 1954 and of the $5,425 received in 1955 Mitchell paid the decedent $5,175 during 1955. *54 In 1955 the decedent proposed and entered into an arrangement with L. M. (Lois Maurine) Chatwell of Abilene, Texas, whereby she would prepare and send to Rose Drilling sales invoices for "retip" and "return" drill bits and, upon receipt of payment of the invoices by Rose Drilling, turn the proceeds over to the decedent. Thereafter, during 1955 and pursuant to the arrangement, she, using data given her by decedent, issued three sales invoices to Rose Drilling in the total amount of $2,405 and in payment thereof received from Rose Drilling two checks in the total amount of $2,405. She cashed the checks and turned over the entire proceeds thereof to decedent. She did not own any bits and had no bits to sell. She was not and never had been in the business of selling drill bits or in handling any retipped or rerun bits, did not own a welding shop, knew nothing about welding machinery, and had no work done on bits listed in the invoices. At the decedent's suggestion she used the name "L. M. Chatwell" on the invoices. At the times when checks were being written in payment of the invoices, the bookkeeper of Rose Drilling inquired of decedent who L. M. Chatwell was and the decedent replied *55 that he was a poor man who was trying to start up a business and that he had no money. Decedent represented to L. M. Chatwell that he was responsible for the payment of income tax on the payments received from Rose Drilling which she turned over to him. The decedent as superintendent of the drilling operations of Rose Drilling approved the invoices for the above-mentioned payments made by Rose Drilling to Halford in 1954, Mitchell in 1954 and 1955, and L. M. Chatwell in 1955. No part of such payments was reported as income or disclosed in the income tax returns of the petitioners for 1954 and 1955. On February 15, 1955, D. L. Rose and the decedent entered into a written agreement in which, among other things, the parties agreed that as of February 15, 1955, Rose Drilling was indebted to D. L. Rose, personally, in the amount of $27,000. In 1954 the decedent owned an airplane which he used to travel from one drilling rig of Rose Drilling to another. On December 19, 1954, the decedent was injured in a crash of the airplane during a trip to inspect a well being drilled by Rose Drilling. In connection with the accident and injury he filed a claim for Workmen's Compensation Insurance *56 under the Rose Drilling's employer's liability insurance contract with Traders & General Insurance Company, Dallas, Texas. A written statement dated February 16, 1955, and made by decedent in connection with the airplane crash and claim for workmen's compensation contains the following: I am employed by D. L. Rose Drilling Contractor. I am the tool-pusher and drilling supt. for the company. I have a salary of $600.00 a month with an unlimited expense account. I have been working for the company 7 years. I am just an employee and I am in no type of partnership with the company. A written statement made by decedent, dated January 9, 1956, and filed by him with the Industrial Accident Board of the State of Texas in connection with his request for the Board's approval of a compromise settlement agreement in the amount of $4,038.37 between him and Traders & General Insurance Company for the injury sustained by him as an employee of Rose Drilling in the airplane accident on December 19, 1954, contains the following: I am employed by the D. L. Rose Drilling Contractor. I am a tool pusher and drilling supt. I have a salary of $600.00 a month, plus expenses. I have been with the company *57 8 years. On January 24, 1956, the Industrial Accident Board approved the compromise settlement as requested by decedent. On or about April 30, 1956, a controversy arose between D. L. Rose and the decedent respecting matters relating to Rose Drilling and their association in connection with the enterprise then terminated. Thereafter, and following his arrest on a charge of felony theft, the decedent on May 5, 1956, gave a written statement to the District Attorney for Taylor County, Texas, respecting the accusation against him wherein he stated that, under the arrangements he had entered into with Mitchell and L. M. Chatwell, he sold drilling bits to Rose Drilling in which it already owned a three-fourths interest and that he knew he was doing wrong when he did so. He further stated that the officers had seized in Abilene and in Albany, Texas, some bits he had stored in those places which he had taken from the rigs of Rose Drilling and which he had intended to sell to Rose Drilling. At the time of giving the foregoing statement the decedent also stated to the District Attorney that he, the decedent, owned a one-fourth interest in the business of Rose Drilling. Decedent and L. *58 M. Chatwell were indicated jointly for felony theft growing out of the transactions she had had with Rose Drilling and in October 1956 the decedent was convicted in the District Court of Taylor County, Texas, of theft of property over the value of $50 and sentenced to a term of 2 years in the Texas State penitentiary. On or about May 15, 1956, D. L. Rose filed suit against decedent in the District Court of Shackelford County, Texas, to annul the agreement of September 25, 1949, on account of decedent's fraud and for damages to the extent of approximately $50,000 covering properties he had stolen from D. L. Rose. D. L. Rose having died testate on July 19, 1958, and the foregoing suit and other litigation arising from the decedent's association with Rose Drilling not having been finally adjudicated, the heirs-at-law of the estate of the decedent and the heirs, legatees, and co-independent executors of the estate of D. L. Rose during September 1959 entered into an agreement of settlement and release whereby the above-mentioned suit and all differences between them respecting the other litigation were settled and disposed of. For each of the calendar years 1951, 1952, 1954, and 1955 *59 a partnership return of income, Form 1065, was filed for Rose Drilling. Each of the returns was executed by D. L. Rose as partner or member and each contained statements that the enterprise was a partnership organized on January 1, 1951, composed of D. L. Rose with a 75 percent distributive share of partnership income or loss and decedent with a 25 percent distributive share of partnership income or loss. The returns disclosed ordinary net income or loss as follows, distributable as indicated: Distributable
Year
Net Income
Net Loss
D. L. Rose
Decedent
1951
$59,653.13
$44,739.85
$14,913.28
1952
523.43
392.57
130.86
1954
$ 6,756.69
(5,067.52)
(1,689.17)
1955
17,058.33
(12,793.75)
(4,264.58)
$60,176.56
$23,815.02
The partnership return of income for 1955 also showed long-term capital gains totaling $27,470.39 resulting from the sale of an oil lease, drill pipe, and casing, distributable as follows: $20,602.80 to D. L. Rose and $6,867.59 to decedent. The decedent was an employee of Rose Drilling during 1954 and 1955. He was always carried as an employee on the books of account of Rose Drilling. In their income *60 tax returns for 1954 and 1955 the petitioners reported wages or salary of $6,923.35 and $5,677.05, respectively, as having been received from Rose Drilling with respect to which income tax was withheld in the amounts of $1,007.50 and $812.50, respectively. In determining the deficiencies here in controversy the respondent made no adjustment with respect to the foregoing items. In their income tax return for 1954 the petitioners reported $1,689.17 as decedent's distributive share of partnership ordinary loss of Rose Drilling for 1954 and took a deduction of the amount in their return. In their income tax return for 1955 the petitioners reported $4,264.58 as decedent's distributive share of partnership ordinary loss of Rose Drilling for 1955 and took a deduction of the amount in their return. Also, in their income tax return for 1955, the petitioners reported $6,867.59 as decedent's distributive share of partnership long-term capital gains of Rose Drilling for 1955 and included in income in their return 50 percent of the amount, or $3,433.80, as gain from the sale or exchange of capital assets. In determining the deficiencies here involved the respondent determined that decedent *61 was not a partner with D. L. Rose in the conduct and operation of Rose Drilling during 1954 and 1955 and that decedent had unreported income of $4,727.50 for 1954 and unreported income of $7,625 for 1955. The respondent disallowed the deduction of $1,689.17 taken for 1954 as the decedent's distributive share of partnership ordinary loss for that year and disallowed the excess of the deduction of $4,264.58 taken for 1955 as the decedent's distributive share of partnership ordinary loss for that year over the amount of partnership long-term capital gain for that year included in income, $3,433.80, or an amount of $830.78. During 1954 and 1955 the decedent was not a partner with D. L. Rose in the conduct of the business of Rose Drilling. Opinion The petitioners take the position that under the terms of the agreement of September 25, 1949, between D. L. Rose and the decedent a partnership culminated on January 1, 1951, between them for the conduct of the business carried on under the name of Rose Drilling with the proportionate interests in the assets, liabilities, profits, and losses of the enterprise being D. L. Rose 75 percent and decedent 25 percent, and that such partnership *62 thereafter continued in subsequent years and throughout 1954 and 1955, the taxable years involved herein. Petitioners contend that their position is sustained by the record and that accordingly they have discharged their burden of proof to show that the respondent erred in determining that the decedent was not a partner with D. L. Rose in the conduct of the business during the taxable years here involved. From the record before us we think it is clear that by their agreement of September 25, 1949, the decedent and D. L. Rose thereby created a working agreement between themselves and provided that such agreement - shall, in the manner, at the time, and under the hereinafter named conditions, culminate in a partnership wherein the proportionate ownership of the parties hereto, in and of the assets, liabilities, and profits of the same shall be as follows, to-wit: D. L. Rose, 75 per cent thereof; R. D. McDaniels, 25 per cent thereof; it being expressly understood and agreed that ownership of all the assets of the said enterprise shall be and remain the property of D. L. Rose until the said D. L. Rose shall have been fully paid for the property and funds contributed by him to the said *63 enterprise. [Italics added.] The agreement provided that D. L. Rose should exercise the power of general manager of the business enterprise at all times during the continuance of the agreement both before and after the assets of the enterprise had been fully paid for. Under the agreement Rose was not restricted in his right to carry on other business, but the decedent was required to use his undivided and utmost endeavors to promote and enhance the mutual interest of the parties to the agreement and was not permitted to engage in any other trade or business for his private benefit or advantage. Nor was he required to contribute cash, credit, or property to the enterprise. Under the agreement it was contemplated that D. L. Rose would contribute the property and funds necessary and appropriate for the conduct of the enterprise, and he was to exercise complete managerial and supervisory control of the business at all times and was responsible for the keeping of separate and accurate books of account wherein should be entered an account of all money and property invested, received, and expended in and about the business and all other matters for things appertaining thereto, and each *64 of the parties was to have access to the books. Under the agreement each of the parties might take out of the cash of the enterprise for his own use an amount of a maximum of $400 during any calendar month. The maximum of $400 which each party was permitted to withdraw from the cash of the enterprise in any one calendar month was cumulative from month to month. From our consideration of the agreement of September 25, 1949, together with all other evidence of record relating thereto, we are of the opinion that it was the intention of the parties thereto that the working agreement therein created was to culminate in a partnership in which the decedent would have the ownership of a 25 percent interest in the assets, liabilities, and income thereof only after D. L. Rose has been fully paid for the property and funds contributed by him to the enterprise. The position of the petitioners is consonant with the foregoing except that they contend that the working agreement was to culminate in a partnership after D. L. Rose had been fully paid for the property and funds he had contributed to the enterprise at the inception of operations under the working agreement. In our opinion the construction *65 proposed by petitioners is not warranted in view of the provision in the agreement that - D. L. Rose has put into said enterprise, as capital stock, a rotary drilling rig of the value of ninety thousand dollars ($90,000.00), and will invest such further property or sums of money as shall be necessary and appropriate to the operation of the business * * * Under the construction proposed by petitioners, decedent would automatically have become the owner of a one-fourth interest in any property or money invested by D. L. Rose in the enterprise in excess of the rig of a value of $90,000. We are unable to conclude from the record that such was the intention of the parties. Except for the rotary drilling rig mentioned in the agreement of September 25, 1949, the record fails to show what property or sums of money were contributed by D. L. Rose to the enterprise following its creation. The record is likewise silent as to what repayments were made to D. L. Rose and when such repayments were made or whether and when, if ever, he was fully repaid for the property and funds contributed by him. The record shows that on February 15, 1955, the enterprise was indebted to him personally in the *66 amount of $27,000 but is entirely silent as to when that indebtedness arose or when, if ever, it was repaid. The state of the record as to the foregoing does not warrant the conclusion that at any time prior to or during the taxable years in question D. L. Rose had been fully repaid and that the agreement of September 25, 1949, had culminated in a partnership between the decedent and him. Although recognizing the failure of their proof in the foregoing respects, the petitioners urge that since the partnership returns for Rose Drilling for 1951, 1952, 1954, and 1955 signed by D. L. Rose contain statements that Rose Drilling was a partnership, organized on January 1, 1951, composed of D. L. Rose with a 75 percent distributive share of partnership net income or loss and decedent with a 25 percent distributive share of partnership net income or loss, they establish their position that the agreement of September 25, 1949, culminated in a partnership on January 1, 1951, and that during the taxable years in question D. L. Rose and decedent were partners in Rose Drilling with partnership interests of 75 percent and 25 percent, respectively. The evidence shows that the returns were prepared *67 by a "tax consultant," but there is nothing in the record to indicate upon what facts or information he relied as the basis for inserting the foregoing statements therein. Further, the petitioners admit on brief that, in litigation involving the affairs of Rose Drilling arising after the termination of the association of the decedent and D. L. Rose in that enterprise, D. L. Rose denied that he and decedent had been partners in the enterprise. The decedent himself in his statement of February 16, 1955, made in connection with his injury in the airplane crash on December 19, 1954, and his claim for workmen's compensation, stated that he was in no type of partnership with Rose Drilling but was just an employee of it at a salary of $600 a month, with an unlimited expense account, and that he had been working for the enterprise for 7 years. In his statement of January 9, 1956, in connection with a request for the approval by the Texas Industrial Accident Board of a compromise settlement agreement for the injury sustained by him in the airplane accident, the decedent stated that he was employed by Rose Drilling at a salary of $600 a month, plus expenses, and that he had been with the enterprise *68 for 8 years. In view of the foregoing and since there is no showing that Rose Drilling was ever represented to the public as being a partnership or that either the decedent or D. L. Rose ever held himself out to the public or to those with whom they did business as being in partnership, we have found that during 1954 and 1955 the decedent was not a partner with D. L. Rose in the conduct of the business of Rose Drilling. The respondent is sustained as to this issue. In their income tax returns for 1954 and 1955 the petitioners reported $6,923.35 and $5,677.05, respectively, as income from wages or salary received from Rose Drilling, with respect to which income tax was withheld in the amounts of $1,007.50 and $812.50, respectively. In determining the deficiencies the respondent made no adjustment with respect to the foregoing items. In their petitions the petitioners assigned error as to respondent's action on the ground that the foregoing amounts were in reality withdrawals by decedent from his capital interest in Rose Drilling and were not taxable income. In his answer the respondent denied the petitioners' assignment of error. On brief the petitioners make no contention that the *69 amounts in question were withdrawals of capital and apparently have abandoned the ground relied on in their assignment of error. However, taking the position on brief that the decedent was a partner with D. L. Rose in Rose Drilling during 1954 and 1955, the petitioners make several contentions as to why the amounts reported for those years as wages or salary were in fact not such. We have found that during 1954 and 1955 decedent was not a partner with D. L. Rose in the conduct of the business of Rose Drilling and also have found that during those years the decedent was an employee of Rose Drilling. Having so found, we sustain the respondent's action, which in effect was accepting as correct and correctly reported the amounts reported by petitioners as wages or salary received from Rose Drilling during 1954 and 1955. The respondent determined that the decedent had unreported income of $4,727.50 for 1954 and unreported income of $7,625 for 1955. As shown by the record and found by us, the decedent during 1954 received $3,150 from Halford and $1,545 from Mitchell, or a total of $4,695 for 1954, and during 1955 received $5,175 from Mitchell and $2,405 from L. M. Chatwell, or a total *70 of $7,580 from 1955. The respondent on brief concedes the difference between the amounts determined by him for the respective years and the foregoing lesser amounts. No part of the foregoing amounts received by decedent was reported by petitioners as income for either 1954 or 1955. Respecting the $3,150 received by decedent from Halford in 1954, the petitioners contend that the amount was paid by Halford to the decedent for materials which he had purchased from the decedent and that since there is no showing that the decedent made any profit thereon, the amount he received was not taxable income. We are unable to find from the record that Halford ever purchased, or otherwise acquired ownership of, any materials from decedent. The record clearly shows that decedent delivered drill bits to Halford to be rebuilt and that when Halford had rebuilt them, the decedent took them away. There is no showing that decedent was the owner of the bits which he delivered to Halford, or was the owner of any portion of them. Further, there is no showing that the decedent ever made an outlay of any character with respect to the bits or any portion of them. Since the petitioners have failed to discharge *71 their burden of showing error as to the respondent's inclusion of the $3,150 in their income for 1954, the respondent's action is sustained. With respect to the amounts received by decedent from Mitchell in 1954 and 1955 and from L. M. Chatwell in 1955, and respondent takes the position that such amounts were received by decedent by theft and, relying on Schira v. Commissioner, 240 F. 2d 672 (C.A. 6, 1957), affirming a Memorandum Opinion of this Court which was based on Rutkin v. United States, 343 U.S. 130 (1952), contends that the amounts constituted taxable income to the decedent and were properly includible in the income of the petitioners for the years in which received by the decedent. The petitioners, taking the position that such amounts were received by decedent by embezzlement or theft and relying on Commissioner v. Wilcox, 327 U.S. 404 (1946), and cases stemming therefrom, contend that the amounts did not constitute taxable income. In Commissioner v. Wilcox, supra, the Supreme Court held that embezzled funds did not constitute taxable income to the embezzler in the year of embezzlement while in Rutkin v. United States, supra, *72 the Court held that extorted money constituted taxable income to the extortionist in the year that the money was received. In Schira v. Commissioner, supra, Schira, a shipping clerk in charge of deliveries of his employer, illegally took from his employer's inventories certain galvanized cans, buckets, and other articles and sent them to one Bennett, not a purchaser, who turned them over to one Bell, who in turn sold them on the market. The proceeds of sale were divided between Bell, Bennett, and Schira. It was there held that the portion of the proceeds so received by Schira was taxable income to him under the ruling in Rutkin v. United States, supra, rather than not taxable income under the ruling in Commissioner v. Wilcox, supra. In the instant case the decedent was convicted of theft, not embezzlement, with respect to his participation in the transactions of L. M. Chatwell with Rose Drilling. Although the record does not show that he was ever tried or convicted with respect to his participation in the transactions of Mitchell with Rose Drilling, the evidence shows that the character of his participation, as well as the character of the *73 transactions, was essentially the same as those of L. M. Chatwell with Rose Drilling, and the petitioners do not contend otherwise. In our opinion the holding in Schira v. Commissioner, supra, is applicable and controlling here and accordingly we sustain the respondent with respect to the amounts received by decedent from Mitchell during 1954 and 1955 and from L. M. Chatwell during 1955. In so holding we have disposed of the issue on the basis of the briefs of the parties. However, it is observed that since the filing of the briefs herein, the Supreme Court has decided James v. United States, 366 U.S. 213 (1961), wherein it expressly overruled Commissioner v. Wilcox, supra, and held that embezzled funds constitute taxable income to the embezzler in the year of embezzlement. As a consequence it appears that the Wilcox case and cases stemming therefrom are no longer authoritative. In determining the deficiencies the respondent disallowed a deduction of $1,689.17 taken for 1954 as decedent's distributive share of the ordinary loss of Rose Drilling for that year and disallowed the excess of the deduction of $4,264.58 taken for 1955 as decedent's *74 distributive share of the ordinary loss of Rose Drilling for that year over the amount reported as decedent's distributive share of the capital gain of Rose Drilling for the years, $3,433.80, or an amount of $830.78. These disallowances resulted from respondent's determination that decedent was not in partnership with D. L. Rose in the conduct of the business of Rose Drilling during the respective years. Since we have found that the decedent was not a partner with D. L. Rose in Rose Drilling during 1954 and 1955, we sustain the respondent as to this issue. Issue 5. Deduction for Repairs to Airplane Findings of Fact In 1954 the decedent owned an airplane which, in his supervision of the drilling operations of Rose Drilling, he used to travel from one rig to another. The rigs generally were located some distance apart. The decedent used the plane for the foregoing purpose under an arrangement whereby Rose Drilling reimbursed him for his expenses for gasoline, upkeep, and storage for the plane. In their income tax return for 1954 under the caption "Other Business deductions not included in partnership" the petitioners deducted $890.87 which was explained as "Repairs to Business *75 Airplane." In determining the deficiency for 1954 the respondent disallowed the deduction on the ground that the decedent had been reimbursed by Rose Drilling for repairs expense. Opinion The parties are in agreement that the decedent during 1954 expended $890.87 for repairs to his airplane. However, they are in disagreement as to whether under his arrangement with Rose Drilling the decedent was reimbursed for such expense. Pointing out on brief that both decedent and D. L. Rose having long since died and the business in question having long since been defunct and stating that the problem of proof is great, the petitioners in effect state that they are unable to establish clearly that the decedent was not reimbursed for the expense in question. In view of the foregoing and since the record fails to show that decedent was not reimbursed, the respondent's action as to this issue is sustained. Issue 6. Casualty Loss on Airplane Opinion In their income tax return for 1955 the petitioners deducted for a casualty loss the amount of $4,000 with the explanation "Business Airplane (Swift 125) Wrecked Total Loss Not Covered by Insurance." In determining the deficiency for 1955 the *76 respondent disallowed the deduction for lack of substaniation. In their petition the petitioners assigned error as to respondent's action. In his answer the respondent denied error. In his opening statement at the trial herein counsel for the petitioners stated that the airplane with respect to which the deduction was taken crashed in 1954 and that he was unable to explain why the deduction was taken in 1955. However, no attempt was made by petitioners to amend their petition so as to make claim for the allowance of the amount in question as a deduction for a casualty loss sustained in 1954. Nor was any attempt made by petitioners to submit proof to show that a casualty loss of $4,000 or any other amount was sustained in either 1954 or 1955. In view of the foregoing the respondent's action as to this issue is sustained. Issue 7. Additions to Tax for Fraud Findings of Fact The income tax returns of the petitioners for 1954 and 1955 were false and fraudulent and were made with intent to evade tax, A portion of the deficiency for each of the years was due to fraud. Opinion Through decedent's arrangement with Mitchell, the latter through false sales invoices obtained from Rose *77 Drilling $1,545 in 1954 and $5,175 in 1955, all of which Mitchell in turn paid over to the decedent during the respective years. Through decedent's arrangement with L. M. Chatwell, she also through false sales invoices obtained from Rose Drilling $2,405 in 1955, all of which she in turn paid to the decedent in that year. No portion of the foregoing amounts was reported as income by the petitioners for either of the taxable years. On authority of Schira v. Commissioner, supra, we have held that the foregoing amounts constituted taxable income to the petitioners for the years in which they were received by decedent. Here, as in that case, the decedent knew that he was receiving the amounts in question, that he was wrongfully obtaining them, and that he was not reporting them as income in his income tax returns. Consequently we think that here, as in the Schira case, the record justifies the finding that the petitioners' returns were false and fraudulent, were made with the intent to evade tax, and that part of the deficiency for each year was due to fraud. In reaching the foregoing conclusion we have considered the arguments of the petitioners on brief that their failure *78 to report the amounts in question as income cannot provide a basis for the assertion of the additions to tax for fraud because under the Wilcox case such amounts did not constitute taxable income to the decedent. However, as heretofore set out, we think that the holding in Schira v. Commissioner, supra, which also involved an addition to tax for fraud and was decided on the authority of Rutkin v. United States, supra, is applicable here and not Commissioner v. Wilcox, supra, as it stood prior to its reversal in James v. United States, supra.
Decisions will be entered under Rule 50.